UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

_____
DISABILITY RIGHTS CENTER-NH,      )
                Plaintiff,      )
                                     )
              v.      )
                                     )      CIVIL ACTION
HELEN HANKS, in her official capacity as      )      FILE NO. 1:18-cv-160-LM
Commissioner of the NEW HAMPSHIRE      )
DEPARTMENT OF CORRECTIONS, and      )
MICHAEL A. ZENK, in his official capacity      )
as Warden of the NEW HAMPSHIRE      )
STATE PRISON FOR MEN,      )
                Defendants.      )
_____)

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EXPEDITED MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff, the Disability Rights Center-NH ("DRC"), is attempting to discharge its duty under federal law to investigate whether the death of an individual with mental illness while housed at the New Hampshire State Prison for Men was the result of neglect. The Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act") authorizes DRC to conduct such an investigation and obligates Defendants, administrators of the New Hampshire Department of Corrections and State Prison for Men, to cooperate by promptly producing records requested by DRC. However, Defendants have failed to provide any records, thereby impeding DRC from exercising its federally mandated duty to protect and advocate for individuals with mental illness in New Hampshire. DRC asks this Court for preliminary relief enjoining Defendants from violating the PAIMI Act so that DRC can conduct a full investigation into the circumstances which led to the death of an individual with mental illness while in Defendants' care.

1

**BACKGROUND**

I.     **DRC's Federal Authority to Investigate Neglect and Access Records Promptly**

DRC is the federally mandated Protection and Advocacy System ("P&A") for the state of New Hampshire.  Complaint 3, ECF No. 1.  Congress established P&A's in 1975 "to protect the legal and human rights of individuals with developmental disabilities," 42 U.S.C. § 15001(b)(2), as provided in the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act").  42 U.S.C. § 6000 *et seq*. (*repealed and replaced* by The Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. § 15001 *et seq*.).

Congress expanded the mission of P&A's in 1986 when it passed the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act").  42 U.S.C. § 10801 *et seq*.  In passing the PAIMI Act, Congress found that "individuals with mental illness are vulnerable to abuse and serious injury . . . [and] are subject to neglect, including lack of treatment . . . [and] health care."  *Id*. § 10801(a)(1), (3).  Congress also found that "State systems for monitoring compliance with respect to the rights of individuals with mental illness . . . are frequently inadequate."  *Id*. § 10801(a)(4).

The purpose of the PAIMI Act is twofold:  to "ensure that the rights of individuals with mental illness are protected" and "to assist States to establish and operate a protection and advocacy system for individuals with mental illness . . . ." *Id*. § 10801(b).  Congress tasked the P&A's with engaging in protection and advocacy activities that protect the human and civil rights of individuals with mental illness and, more specifically, with "investigat[ing] incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred."  *Id*. § 10801(b)(2)(B).  To enable P&A's to carry out their investigatory duties, Congress mandated that P&A's shall "have

access to all records of" certain individuals with mental illness, *id*. § 10805(a)(4), as explained more fully in the Argument below.

## II.   Defendants' Interference with DRC's Federally Authorized Investigation of Defendants' Suspected Neglect

On December 7, 2017, DRC became aware that P.B., a 34-year-old man with mental illness, had died due to self-injurious behavior while he was alone in his cell on the Residential Treatment Unit ("RTU") of the New Hampshire State Prison for Men ("NHSPM").  *Inmate dies at state prison treatment unit after "self-injurious" behavior*, NH Union Leader, Dec. 7, 2017, *available at* http://www.unionleader.com/public-safety/inmate-dies-at-state-prison-treatment-unit-after-self-injurious-behavior-20171207.  The Department's internal policy states that the "RTU is designed for those inmates with mental illness who are unable to function in the general inmate population," and provides "quality mental health services" to unit residents.  NH Department of Corrections Policy and Procedure Directive 6.32, I.A. (2009), *available at* https://www.nh.gov/nhdoc/policies/documents/6-32.pdf.  Pursuant to the PAIMI Act, 42 U.S.C. § 10805(a)(4), DRC determined there was probable cause to believe that P.B. may have died as a result of RTU staff's neglect, as explained below in Argument, Section I.

On December 18, 2017, DRC notified counsel for Defendants that it had determined probable cause to investigate P.B.'s death and requested various records pursuant to its authority under the PAIMI Act and its implementing regulations.  *See* Ex. A, ECF No. 1-1.  The records DRC requested included all investigation reports concerning the death of P.B., including any reports considered "peer review" or "quality assurance" records, along with any documents reviewed during the course of the investigation or relied upon in reaching conclusions regarding his death.  *Id*.

DRC specifically cited the statutory requirement that P&A's be given prompt access to records, and requested that the Defendants produce the records by January 8, 2018. *Id*. On January 9, 2018, more than three weeks after DRC's request for prompt access to records, Defendants challenged DRC's probable cause determination, stating that DRC did not have probable cause to investigate P.B.'s death. *See* Ex. B; ECF No. 1-2. Specifically, Defendants' counsel stated: "While it is understood that the DRC has the authority to investigate incidents of abuse or neglect . . . pursuant to 42 USC § 10805, that authority is limited to when abuse or neglect is reported to the system or there is probable cause to believe that abuse or neglect occurred." *Id*. Counsel went on to state that "[t]here is no reasonable inference that can be drawn, from your letter or otherwise, to suggest either abuse or neglect occurred." *Id*.

On January 11, 2018, DRC responded to Defendants' counsel in writing, restating its authority to investigate suspected incidents of abuse and neglect and explaining in greater detail the basis for its probable cause determination. *See* Ex. C, ECF No. 1-3. DRC also emphasized that it is well-established law that the P&A is the final arbiter of probable cause for the purpose of triggering its federal access authority under the PAIMI Act. *See, e.g.*, *Ariz. Ctr. for Disability Law v. Allen*, 197 F.R.D. 689, 693 (D. Ariz. 2000); *Office of Prot. and Advocacy for Persons with Disabilities v. Armstrong*, 266 F. Supp. 2d 303, 321 (D. Conn. 2003). DRC requested a response by January 16, 2018 to discuss the release of all requested records. *See* Ex. C.

Defendants did not respond to DRC's January 11th letter. Compl. 10. DRC followed up with multiple voice messages and an email to counsel for Defendants, requesting a response to its records request as soon as possible. *Id.*; Ex. D, ECF No. 1-4. Defendant's counsel replied on January 26, 2018 and stated that counsel would "take a look at [the January 11th] letter, likely this weekend and respond." Ex. D. Defendants' counsel did not respond. *Id*. On January 30th,

DRC again contacted Defendants' counsel by email and voice message requesting a status update on Defendant's response to its records request.  *Id*.  On February 2nd, DRC had a phone conversation with counsel for Defendants, who stated that DRC's January 11th letter had not yet been reviewed.  Defendants' counsel was unable to state when DRC could expect a response. Compl. 10.  Counsel maintained Defendants' position that DRC did not have probable cause to investigate P.B.'s death.  *Id*.

On February 20, 2018, DRC filed suit, requesting that this Court preliminarily and permanently enjoin Defendants from violating federal law and ordering Defendants to produce the requested records.  *Id*.  By failing to cooperate with DRC's request for records to investigate P.B.'s death, Defendants are preventing DRC from "accomplish[ing] its congressional mandate to investigate incidents of abuse and neglect," *Allen*, 197 F.R.D. at 693, and from assessing whether there is an ongoing threat to the safety of vulnerable, isolated individuals with mental illness who reside in the RTU.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish the following four factors: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the plaintiff's favor; and (4) an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In this case, each of the four factors weigh in favor of granting DRC's motion for a preliminary injunction so that DRC can conduct a timely and effective investigation into suspected neglect.

## ARGUMENT

## I.   DRC is Likely to Succeed on the Merits

DRC is likely to succeed on the merits because the PAIMI Act explicitly grants DRC broad access to the requested records.  As set forth below, DRC determined there was probable cause to believe neglect may have caused P.B.'s death in accordance with the criteria necessary to trigger DRC's access authority under federal law.  42 U.S.C. § 10805(a).  Defendants denied DRC access to records because they disagreed that DRC had the requisite probable cause to believe neglect caused P.B.'s death; however, as the P&A, DRC is the "final arbiter" of probable cause.  *See, e.g.*, *Armstrong*, 266 F. Supp. 2d at 321.  Once DRC determined probable cause to suspect neglect, it was entitled to access the records "promptly," 42 C.F.R. § 51.41(a), yet Defendants have withheld the records for over two months, a delay that cannot reasonably be considered prompt under the circumstances.  DRC must be granted immediate access to "all records of" P.B., 42 U.S.C. § 10805(a)(4), including peer review and quality assurance records, and the records of Defendants' pending investigation, despite any state law protections or agency policies which are preempted by the PAIMI Act.  *See, e.g.*, *Houstoun*, 228 F.3d at 428.

## A.  DRC is Entitled to Access the Records of P.B. Under the PAIMI Act

The PAIMI Act mandates that a P&A such as the DRC shall "have access to all records of" certain subsets of individuals with mental illness.  42 U.S.C. § 10805(a)(4).  The subset of individuals relevant to this case is any individual, "including an individual who has died," who cannot authorize the P&A to have access to records; who lacks a legal guardian, conservator, or other representative; and for whom the P&A has received a complaint or determined there is probable cause to believe the individual was subject to abuse or neglect.  *Id*. § 10805(a)(4)(B).

P.B. is "an individual who has died" and who meets the three listed criteria.  First, P.B. is unable to authorize DRC's access to his records because he has died.  *See Armstrong*, 266 F. Supp. 2d at 317.  Second, P.B. does not have a legal guardian because, if he had been subject to a

guardianship while alive, any guardianship terminated upon his death in accordance with state law.  N.H. Rev. Stat. Ann. § 464-A:40, I (2017)[1].  Third, the newspaper article describing P.B.'s death constituted both a complaint received by DRC and probable cause to believe that P.B. was subjected to neglect, as explained next.

The federal regulations implementing the access mandate of the PAIMI Act define "probable cause" as "reasonable grounds for belief that an individual with mental illness has been, or may be at significant risk of being[,] subject to abuse or neglect."  42 C.F.R. § 51.2.  The definition goes on to give the P&A staff broad discretion in making the determination of probable cause:  "The individual making such determination may base the decision on reasonable inferences drawn from his or her experience or training regarding similar incidents, conditions or problems that are usually associated with abuse or neglect."  *Id.*

The PAIMI Act defines "neglect" to mean "a negligent act or omission by any individual responsible for providing services in a facility rendering care or treatment which caused or may have caused injury or death to a[n] individual with mental illness or which placed a[n] individual with mental illness at risk of injury or death . . . . "  42 U.S.C. § 10802(5).  The definition specifically includes such acts or omissions as the "failure to establish or carry out an appropriate individual program plan or treatment plan . . . , the failure to provide adequate nutrition, clothing, or health care . . . , or the failure to provide a safe environment for a[n] individual with mental illness, including the failure to maintain adequate numbers of appropriately trained staff."  *Id.*

The newspaper article reporting P.B.'s death provided DRC with reasonable grounds to believe that he was an individual with mental illness whose death was caused, or may have been

---

[1] Moreover, DRC has no evidence that P.B. had a legal guardian, conservator, or other legal representative; if P.B. had one, it would have been incumbent upon Defendants to promptly notify DRC of that person's name and contact information when Defendants delayed or denied DRC's request for records.  *See* 42 C.F.R. § 51.43; *Armstrong*, 266 F. Supp. 2d at 318.

caused by, RTU staff's negligent acts or omissions.  The article characterized the death as the result of self-injurious behavior occurring while P.B. was alone in his cell in the RTU.  DRC reasonably inferred that his death may have been caused by RTU staff committing negligent acts or omissions, which may have included failing to establish or carry out a treatment plan appropriate for protecting P.B. from engaging in self-injurious behavior; failing to provide him adequate health care such as effective medications and timely emergency health care; and failing to provide P.B. a safe environment, including appropriate levels of supervision, a cell free of objects or surfaces on which he could fatally injure himself, or a unit with adequate numbers of appropriately trained staff.  DRC drew its inference of potential neglect from its staff members' experience and training in their role as New Hampshire's P&A charged with investigating incidents of suspected abuse and neglect in facilities and programs around the state.  *See* 42 U.S.C. § 10801 *et seq.*

DRC also reasonably inferred from the newspaper article and its experience as New Hampshire's P&A that P.B. was an "individual with mental illness" and that RTU staff were "responsible for providing services in a facility rendering care or treatment" under the PAIMI Act.  *See* § 10802(5).  Defendants' publicly available policy states that "[t]he RTU is designed for those inmates with mental illness who are unable to function in the general inmate population.  The goal of this unit is to provide quality mental health services . . . . "  NH DOC Directive 6.32, I.A.  The PAIMI Act defines "individual with mental illness" to include an individual "who has a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State . . . who is an inpatient or resident in a facility rendering care or treatment . . . . "  § 10802(4)(A)-(B)(i)(I).  The Act provides that "'facilities' may include, but need not be limited to . . . jails and prisons."  §

10802(3).  The implementing regulations elaborate that a "[f]acility includes any public or private residential setting that provides overnight care accompanied by treatment services," which includes "jails and prisons, including all general areas as well as special mental health or forensic units." 42 C.F.R. § 51.2.

Defendants disagreed that the newspaper article provided DRC with sufficient information to suspect neglect.  However, a newspaper article can be the sole source of information about a suspected incident of abuse or neglect and suffice to provide a P&A with probable cause to access records under the PAIMI Act.  *See Armstrong*, 266 F. Supp. 2d at 308 (holding DOC could not require P&A to substantiate probable cause determination based solely on newspaper account).  Moreover, a newspaper article is included in the definition of "complaint" which, like probable cause, triggers a P&A's access authority.  42 U.S.C. § 10805(a)(4)(B)(iii); 42 C.F.R. § 51.2.  The newspaper article informing DRC of P.B.'s death thus provided two independent bases for satisfying the statutory elements that triggered DRC's right to access his records.

Moreover, federal courts have overwhelmingly held that a P&A's access to records cannot be denied or delayed because its determination of probable cause has been disagreed with or called into question.  *See, e.g.*, *Prot. and Advocacy Syst., Inc. v. Freudenthal*, 412 F. Supp. 2d 1211, 1219 (D. Wy. 2006); *Armstrong*, 266 F. Supp. 2d at 321 ; *Ctr. For Legal Advocacy v. Earnest*, 188 F. Supp. 2d 1251, 1257 (D. Colo. 2002) (*rev'd on other grounds*, 320 F.3d 1107 (10th Cir. 2003)); *Iowa Prot. and Advocacy Servs. Inc. v. Rasmussen*, 206 F.R.D. 630, 638 (S.D. Iowa 2001); *Advocacy Inc. v. Tarrant Cnty. Hosp. Dist.*, No. 4:01-CV-062-BE, 2001 WL 1297688, at *4 (N.D. Tex. Oct. 11, 2001); *Allen*, 197 F.R.D. at 693.  Indeed, "it is by now a settled principle that the P&A is the final arbiter of probable cause for the purpose of triggering

its authority to access all records for an individual that may have been subject to abuse or neglect." *Armstrong*, 266 F. Supp. 2d at 321 (quotation omitted).  "To conclude otherwise would frustrate the purpose of the P & A laws to establish an effective system to protect and advocate for the rights of individuals with disabilities."  *Allen*, 197 F.R.D. at 693.

### B.  DRC is Entitled to Access the Records Promptly

Once a P&A such as DRC makes the requisite determination of probable cause or receives a complaint, the federal regulations implementing the PAIMI Act mandate that "[a]ccess to records shall be extended *promptly* to all authorized agents of a P&A system."  42 C.F.R. § 51.41(a) (emphasis added); *Mich. Prot. & Advocacy Servs., Inc. v. Flint Cmty. Sch.*, 146 F. Supp. 3d 897, 904 (E.D. Mich. 2015).  Although the promptness requirement is not specified in a precise number of days, courts have found delays of months to violate the PAIMI Act.  *See, e.g.*, *Flint*, 146 F. Supp. 3d at 903 (finding three to six month delay was not "prompt"); *Wis. Coal. for Advocacy, Inc. v. Busby*, No. 02-C-871, 14-15 (E.D. Wisc. Sept. 24, 2003) (finding three month delay not "prompt").

Prompt access is critical because delayed receipt of records undermines the effectiveness of DRC's investigation.  In order to fulfill its statutory mandate to protect the rights of vulnerable individuals, 42 U.S.C. § 10801(a)(4), DRC must be able to commence its investigation before evidence begins to disappear or deteriorate and before any persisting conditions of neglect expose other residents to similar harms.  *See. Czaplewski*, 131 F. Supp. 2d at 1050-51.

PAIMI's companion statute, the DD Act, generally requires access to records within three business days of a request, but mandates in the event of a death that the P&A shall "have immediate access, not later than 24 hours after" the P&A's request.  42 U.S.C. § 15043(a)(2)(J). Several courts have found the DD Act's more precise deadlines instructive for mandating the

timing of access to records under PAIMI.  *See Flint*, 146 F. Supp. 3d at 908 (ordering defendants

to provide access to records under the PAIMI Act within 5 days); *Freudenthal*, 412 F. Supp. 2d

at 1220-21 (finding "the parties may use the deadlines in the DD Act as a guideline for requests

under the PAIMI Act" with "some leeway" for "very broad and time intensive requests"); *Busby*,

No. 02-C-871, 14-15 (finding deadlines in DD Act suggestive that under PAIMI "'prompt' is

more likely a matter of days or perhaps weeks, but not months").  These courts have interpreted

the two acts consistently because they are companion statutes in which the DD Act provides

access to records of individuals with developmental disabilities based, like access to records

under the PAIMI Act, on the P&A's receipt of a complaint or determination of probable cause.

*Compare* 42 U.S.C. § 10805(a)(4) *with* 42 U.S.C. § 15043(a)(2)(I); *see Freudenthal*, 412 F.

Supp. 2d at 1220-21; *Busby*, No. 02-C-871, at 14-15; *accord*, *Iowa Prot. and Advocacy Serv.,*

*Inc., v. Gerard Treatment Programs, LLC*, 152 F. Supp. 2d 1150, 1164 (N.D. Iowa 2001).[2]

Whether under the instructive timelines prescribed by the DD Act or under a more

generous interpretation of "promptly," Defendants have failed to promptly allow DRC access to

the records of P.B.  Defendants did not produce any records before this suit was filed over two

months after DRC's request, and still have not produced them by the date of this motion.  While

the PAIMI Act does not specifically define "promptly," Defendants have delayed access well

past the point of promptness under its plain meaning.  *See* "prompt, adjective," Merriam

Webster, https://www.merriam-webster.com/dictionary/promptly (last visited Mar. 5, 2018)

("being ready and quick to act as occasion demands" or "performed readily or immediately").

---

[2] Interpreting companion acts consistently follows longstanding precedent.  *See Kleinfelter v. United States.*, 318 F.2d 929, 931 (Cl. Ct.. 1963) ("It has been frequently held that statutes in pari materia are considered as if they constituted but one Act, so that sections of one Act may be considered as though they were parts of the other Act").  Courts have interpreted other requirements of the PAIMI and DD Acts to be consistent, too.  *See Ala. Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.*, 894 F. Supp. 424, 428 (M.D. Ala. 1995), *aff'd*, 97 F.3d 492 (11th Cir. 1996); *Tarrant*, 2001 WL 1297688, at *2; *Gerard*, 152 F. Supp. 2d at 1167 (N.D. Iowa 2001).

Defendants' communications with DRC about the record request indicate three possible reasons for delayed access, but none of those reasons support an argument that a delay of over two months could be considered prompt under the PAIMI Act.  First, Defendants' counsel has indicated that she has been occupied by other matters.  However, the schedule of Defendants' attorney cannot alter DRC's right to conduct an effective investigation into suspected neglect, especially when other residents of the facility may be exposed to the same ongoing risks.  *See Czaplewski*, 131 F. Supp. 2d at 1050-51.

Second, Defendants have disagreed with DRC's determination of probable cause. However, Defendants are not entitled to question DRC's determination of probable cause. *See, e.g.*, *Armstrong*, 266 F. Supp. 2d at 321.  "A determination of probable cause made by the [P&A] will not be reevaluated by the state or service provider merely because the state or service provider disagrees that probable cause exists." *Earnest*, 188 F. Supp. 2d at 1257.  The purpose of the PAIMI Act would be undermined if the facility suspected of neglect could evade investigation simply by disagreeing with the P&A's suspicion of neglect.  *See, e.g.*, *Allen*, 197 F.R.D. at 693 (allowing facility to deny access by disagreeing with the determination of probable cause "would frustrate the purpose of the P & A laws").

Third, Defendants have indicated that if they were to produce records, they would not release records of Defendants' internal investigation until the investigation is complete.  *See* Ex. B, D.  However, that reason is not relevant to all non-investigative records, nor does it justify delayed access to the pending investigation records themselves, as explained in subsection C.2, *infra*.  *See Busby*, No. 02-C-871 at 14-15 (access to records after delay of three months because of ongoing criminal investigation into death was not "prompt").

Even if Defendants were to produce all requested records in the near future, they

nevertheless have violated federal law requiring prompt production of records.  *See* 42 C.F.R. §

51.41(a); *Flint*, 146 F. Supp. 3d at 904 (rejecting mootness argument after records were produced

because PAIMI requires "not simply that the records should be produced, but that they be

produced *promptly*").  No reasonable interpretation of the word "promptly" could abide a delay

of over two months in the context of complying with a federally authorized investigation into

suspected neglect, especially because other residents may remain at risk of similar neglect.

### C.  DRC is Entitled to Access All Records of P.B.

Upon determining there was probable cause to believe that P.B. had been subjected to

neglect, DRC became entitled to access a broad array of records.  The PAIMI Act mandates that

a P&A shall "have access to *all* records of" the individual.  *See* 42 U.S.C. § 10805(a)(4)

(emphasis added).  Statutory amendments and the federal courts have clarified that "all records

of" the individual include not only records belonging to the individual but also other records

belonging to the facility or outside entities, such as investigative, peer review, and quality

assurance records.  *See Id*. § 10806(b)(3)(A); *Houstoun*, 228 F.3d at 427; *Ctr. for Legal

Advocacy v. Hammons*, 323 F.3d 1262, 1268-69 (10th Cir. 2003).

### 1.  The PAIMI Access Mandate Pre-Empts State Law Protections for Quality Assurance and Peer Review Records

Quality assurance and peer review records are important sources of information in a P&A

investigation into conditions of suspected neglect.  Such records may contain the candid opinions

of health care professionals evaluating the quality of care.  *See* H.R. Rep. No. 102-319, at 6

(1991), *reprinted in* U.S.C.C.A.N. 777, 782 (stating peer review committees "review and

evaluate patient care in the facility in order to improve the quality of care"); N.H. Rev. Stat. Ann.

§ 151-D:1 (2018) (quality assurance programs "monito[r] and evaluat[e] the quality and

appropriateness of the care provided, so that important problems and trends in the delivery of care are identified and that steps are taken to correct problems"). Such records are important not only for the information they contain about the particular incident under review, but also for the P&A to assess whether the facility is taking appropriate steps to mitigate the risk of similar incidents involving other residents. *See Ind. Prot. & Advocacy Servs.,* 376 F. App'x at 633 (finding delayed access to peer review records after patient's death "stym[ied] [P&A's] ability to effectively protect and advocate on behalf of other individuals with mental illness.")

Many states have laws protecting certain entities' quality assurance or peer review records from disclosure, but all five Circuit Courts of Appeals which have considered a P&A's ability to access such records have decided in favor of P&A access despite state law protections, with two of those decisions authored by current justices of the U.S. Supreme Court. *See Ind. Prot. & Advocacy Servs. v. Ind. Family and Soc. Servs. Admin.*, 603 F.3d 365, 382-83 (7th Cir. 2010); *Prot. & Advocacy for Persons with Disabilities, Conn. v. Mental Health & Addiction Servs.*, 448 F.3d 119, 126 (2d Cir. 2006) (Sotomayor, J.); *Mo. Prot. & Advocacy Servs. v. Mo. Dep't of Mental Health*, 447 F.3d 1021, 1023 (8th Cir. 2006); *Hammons*, 323 F.3d at 1269-70 (10th Cir. 2003); *Houstoun*, 228 F.3d at 428 (3d Cir. 2000) (Alito, J.).

The PAIMI Act contains a specific provision preempting any state laws prohibiting P&A access to records after May 23, 1988. *See* 42 U.S.C. § 10806(b)(2)(C); *Prot. & Advocacy For Persons With Disabilities, Conn.*, 448 F.3d at 127 (noting the "clear preference for preemption in PAIMI's text"). The Circuit Courts of Appeals have agreed that PAIMI's broad access mandate preempts any conflicting state laws restricting access to quality assurance or peer review records, particularly in the context of death investigations. *See, e.g., Houstoun*, 228 F.3d at 428 (granting P&A access to peer review records in patient's death investigation); *Hammons*, 323 F.3d at 1270

(same as to both peer review and quality assurance records).

The regulations implementing P&A access contain a savings clause stating: "nothing in this section is intended to preempt State law protecting records produced by medical care evaluation or peer review committees." 42 U.S.C. § 51.41(c)(4). However, the Circuit Courts of Appeals have invalidated that regulatory language as an unreasonable interpretation of the PAIMI Act's broad record access mandate. *Mo. Prot. & Advocacy Servs.*, 447 F.3d at 1024; *Hammons*, 323 F.3d at 1272; *Houstoun*, 228 F.3d at 427 (Alito, J.) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984)). Another Circuit Court did not even find it necessary to invalidate the regulatory provision, stating: "[b]ecause we conclude that Congress has clearly spoken to the question of whether [the P&A] may have access to [patients'] peer review records, we do not proceed to the second step of the *Chevron* analysis to determine whether the regulatory interpretation is a permissible construction of the statute." *Prot. & Advocacy for Persons With Disabilities, Conn.*, 448 F.3d at 128 (Sotomayor, J.).

In a statute similar to the other state laws preempted by the PAIMI Act, New Hampshire state law provides: "Records of an ambulatory care clinic's quality assurance program . . . shall be confidential and privileged and shall be protected from direct or indirect means of discovery, subpoena, or admission into evidence in any judicial or administrative proceeding." N.H. Rev. Stat. Ann. § 151-D:2, I. The state law defines "ambulatory care clinic" to include "medical facilities operated by" the Department of Corrections' Division of Medical and Psychiatric Services. *Id*. § 151-D:1, I. Whether or not the RTU qualifies as an "ambulatory care clinic" under state law, DRC is entitled to the RTU's quality assurance records despite any applicable state law protections for the following three reasons.

First, the plain language of the PAIMI Act authorizes a P&A such as DRC to "have

access to *all* records of" the individual.  42 U.S.C. § 10805(a)(4) (emphasis added).  Any quality assurance documentation related to the care of P.B. falls within the meaning of "all records." *See Hammons*, 323 F.3d at 1270 ("all records of . . . [the] individual . . . include peer review and quality assurance records relating to a patient and his or her care").  The New Hampshire statute refers to quality assurance documentation as "records," defining them to include "records of interviews, internal reviews and investigations, and all reports, statements, minutes, memoranda, charts, statistics, and other documentation generated during the activities of a quality assurance program."  § 151-D:1, II.  The PAIMI regulations, without the invalidated savings clause, define "records" to include "[r]eports prepared by individuals and entities performing certification or licensure reviews, or by professional accreditation organizations, as well as related assessments prepared for the facility by its staff, contractors or related entities . . . . "  42 C.F.R. § 51.41(c)(4).

Second, Congress intended a P&A to have access to records that are confidential under state law:  The PAIMI Act requires a P&A accessing "records which, under Federal or *State* law, are required to be maintained in a confidential manner" to "maintain the confidentiality of such records to the same extent as is required of the provider . . . . "  42 U.S.C. § 10806(a) (emphasis added).  Courts have disposed of facilities' concerns about disclosing peer review and quality assurance records protected by state law by pointing out that the P&A must maintain the records' confidentiality.  *See Prot. & Advocacy For Persons With Disabilities, Conn.*, 448 F.3d at 129; *Hammons*, 323 F.3d at 1270–71; *Houstoun*, 228 F.3d at 428–29.  "There is therefore little to no risk that the information the [peer review] records contain would be publicly disclosed or that the information would be used for some purpose unrelated to the [P&A's] mandate."  *Ind. Prot. And Advocacy Servs.*, 376 F. App'x at 632.

Third, RSA 151-D:2 only protects quality assurance records from "discovery, subpoena,

or admission into evidence in any judicial or administrative proceeding." DRC's access to the records is not prohibited by state law because DRC seeks access for an investigation into suspected neglect, not for a judicial or administrative proceeding. *See Houstoun*, 228 F.3d at 428 ("[The P&A] is seeking the peer review reports in order to fulfill the advocacy and investigatory purposes of PAMII with regard to [a patient's] death," not "to discover the reports or to introduce them into evidence in a civil action"); *Hammons*, 323 F.3d at 1269 (same).

DRC is entitled to the quality assurance records notwithstanding a New Hampshire Supreme Court decision in an unrelated case between the same parties. *See Disabilities Rights Ctr., Inc. v. Comm'r, N.H. Dept. of Corr.*, 143 N.H. 674 (1999). Leading up to that case, DRC requested records of the Secure Psychiatric Unit ("SPU"), another unit located at the New Hampshire State Prison for Men for which DRC had determined probable cause to suspect neglect under the PAIMI Act. *Id*. at 675. As in the instant case, Defendants failed to provide DRC access to the records, forcing DRC to file suit to vindicate its federal rights to investigate suspected neglect. *Id*. at 676. Three weeks after DRC filed, Defendants provided DRC with most of the requested records, but withheld quality assurance records based on RSA 151-D. *Id*. The New Hampshire high court recognized that, under the Supremacy Clause of the United States Constitution, the PAIMI Act entitles DRC to access "records" notwithstanding state laws to the contrary. *Id*. However, it found that quality assurance records were not "records" for purposes of the PAIMI Act based on legislative history and the regulations' savings clause purporting to exempt peer review records protected by state law. *Id*. at 677-78.

The reasoning of the 1999 New Hampshire Supreme Court decision has been resoundingly rejected by each of the five federal Circuit Courts of Appeals which have considered the issue of peer review records protected by state law, as explained above. Four of

those courts explicitly referenced the New Hampshire Supreme Court decision and declined to

follow its reasoning.  *See Prot. & Advocacy for Persons with Disabilities, Conn.*, 448 F.3d at 126

(Sotomayor, J.); *Mo. Prot. & Advocacy Servs.*, 447 F.3d at 1025; *Hammons*, 323 F.3d at 1269-

70; *Ind. Prot. And Advocacy Servs.*, 376 F. App'x at 632 (characterizing New Hampshire

decision as an "apparent outlier" in contrast to the five Circuit Courts of Appeals in agreement

on the issue).  Federal courts agree that a P&A is entitled to access peer review or quality

assurance records despite state law restrictions.

### 2.  DRC is Entitled to Access Records of a Pending Investigation

Equally important to fulfilling DRC's federal mandate is receiving prompt access to the

records of Defendants' pending internal investigation into P.B.'s death.  Congress, finding that

"State systems for monitoring compliance with respect to the rights of individuals with mental

illness . . . are frequently inadequate," 42 U.S.C. § 10801(a)(4), intended P&A's to function as an

"independent check on existing state systems designed to investigate abuse and neglect" and "to

insure that incidents of abuse and neglect are properly investigated."  *Busby*, No. 02-C-871 at 15-

16 (citation omitted).  DRC cannot play this role if access to Defendants' internal investigative

records can be delayed for several months until Defendants deem their investigation "final."

Access to pending internal investigation records is crucial because Defendants' staff are in a far

better position than DRC to immediately gather evidence and information about an incident, yet

they occupy an inherently conflicted position of investigating their own colleagues.  Thus, to

conduct an effective independent investigation, DRC must receive information about the internal

investigation soon enough to review evidence before witnesses' memories may fade, physical

evidence may become stale or unavailable, and documents may be destroyed.  *See Busby*, No.

02-C-871 at 13 (finding P&A access to death investigation reports is essential because they

"contain the best, sometimes the only, evidence as to the precise cause of death").

Defendants contend that, if they produce records, they need not produce the records of their pending investigation until it is completed.  *See* Ex. B, D.  This logic gives Defendants an incentive to delay their internal investigation so that DRC cannot conduct an effective independent investigation.  On January 9, 2018, Defendants' counsel stated the internal investigation, which is being conducted jointly with the State Police, would be ongoing for at least another 90 days, meaning there would be a minimum delay of nearly four months after DRC's request for the records.  *See* Ex. B.  Defendants' withholding of the pending investigation records violates the PAIMI Act requirements that DRC is entitled to access "all records" of P.B., and to access them "promptly."  *See* 42 C.F.R. § 51.41(a).

The PAIMI Act and regulations define "records" to include various reports and information preceding a final investigation report.  These include "the steps taken to investigate such incidents," § 10806(b)(3)(A), and reports describing supporting information used or reviewed in the course of the investigation, such as who was interviewed and physical and documentary evidence.  42 C.F.R. § 51.41(c)(2)(iv).  Moreover, the regulations provide access to such records "whether written or in another medium, *draft* or final . . . . "  *Id.* § 51.41(c) (emphasis added).  "Thus, the regulations, on their face, require the disclosure of draft reports from investigatory agencies."  *Disability Rights N.Y. v. Wise*, 171 F. Supp. 3d 54, 61 (N.D.N.Y. 2016).  The PAIMI Act clarifies that the P&A is entitled to investigative records whether prepared by facility staff or by an investigative agency.  42 U.S.C. § 10806(b)(3)(A); *Wise*, 171 F. Supp. 3d at 61; *Rasmussen*, 521 F. Supp. 2d at 910.

Given a P&A's duty to maintain the confidentiality of records, 42 U.S.C. § 10806(a), investigation records cannot be withheld because of their confidential nature.  *Wise*, 171 F. Supp.

3d at 60.  In addition, the PAIMI Act's mandate for broad, prompt access to records preempts any state law protections on access to records.  *See* Section C.1 *supra*; *see also Busby*, No. 02-C-871, at 14 (applying preemption to investigative records).

In summary, DRC is entitled to access reported information about any internal or joint investigation activities, witnesses, and evidence collected thus far, as well as draft reports about the incident.  All such records must be provided "promptly," not when the entire investigation process has completed after a period of months.  § 51.41(a); *Busby*, No. 02-C-871, at 14-15 (holding that delaying release of records for three months because of pending criminal investigation violated PAIMI promptness requirement).  Only with prompt access to Defendants' pending investigative records can DRC function, as Congress intended, as an "independent check" on potentially inadequate state systems for protecting vulnerable individuals.

## II.    DRC Faces Imminent and Irreparable Harm

DRC is likely to suffer irreparable harm if Defendants are not immediately enjoined from continuing to violate the PAIMI Act.  Without prompt access to all records of P.B., DRC cannot conduct an effective investigation and fulfill its Congressionally mandated purpose to protect and advocate for individuals with mental illness.  As time passes, witnesses may become unavailable or their memories may fade, other evidence may become unavailable, records may be destroyed, and, importantly, other residents of the facility may continue to be exposed to the same conditions leading to P.B.'s death.  *See Czaplewski*, 131 F. Supp. 2d at 1050-51 (agreeing with P&A's showing of irreparable harm based on risks of memory loss and witnesses dying or becoming inaccessible, missed opportunities to abate neglect, and the risk of injury or death to other residents).

Several courts have agreed that delayed access to records causes irreparable harm, both to

the P&A itself and the individuals whom they protect.  Delayed access irreparably harms the P&A's ability to perform its legal duty to conduct a prompt investigation.  *See, e.g.*, *Armstrong*, 266 F. Supp. 2d at 311; *Czaplewski*, 131 F. Supp. 2d at 1050-51.  And courts granting preliminary injunctions have expressed concern that individuals with disabilities may continue to be at risk of injury, abuse, or neglect while P&A access is denied.  *See, e.g.*, *Flint,* 146 F. Supp. 3d at 903; *Gerard*, 152 F. Supp. 2d at 1172–73.

The harms to DRC and individuals who remain vulnerable to suspected neglect are not mitigated by the fact that Defendants are conducting their own investigation into the incident. "Whether or not other investigations have already been conducted . . .  [the P&A] is still irreparably harmed by being prevented from pursuing fully its right to access records . . . . " *Gerard*, 152 F. Supp. 2d at 1173.  Despite the existence of investigations by state authorities, Congress established P&A Systems "to insure that incidents of abuse and neglect were properly investigated," *Busby*, No. 02-C-871 at 16, having found that "State systems for monitoring compliance with respect to the rights of individuals with mental illness . . .  are frequently inadequate."  42 U.S.C. § 10801(a)(4).

Even if Defendants were to produce records in the near future, DRC requires a preliminary injunction mandating prompt access to any further records that DRC requests in the future, such as newly developed records in Defendants' ongoing investigation or the records of other RTU residents for whom DRC determines there is probable cause to suspect abuse or neglect.  For DRC to fulfill its Congressionally mandated role, its future access to records must not be delayed past the point of promptness.  Such delays force DRC to resort to otherwise unnecessary litigation, which drains DRC staff's capacity to monitor and investigate the rights and safety of individuals with disabilities. *See Disability Rights N.Y. v. N. Colonie Bd. of Educ.*,

No. 1:14-CV-0744, 2016 WL 1122055, at *9 (N.D.N.Y. Mar. 21, 2016) ("To require [the P&A] to always obtain a court order to perform its statutory investigative responsibilities would stifle its mission to provide timely and effective advocacy for those it is charged with protecting"); *Tarrant*, 2001 WL 1297688, at *6) (finding that requiring the P&A "to relitigate the issue every time it . . . seeks to obtain access to patient records would delay its investigations and defeat the purpose of the PAIMI Act"); *Stalder*, 128 F. Supp. 2d at 368 (same).

Accordingly, other courts have issued injunctions governing the promptness with which future P&A requests must be fulfilled.  *Flint*, 146 F. Supp. 3d at 908 (commanding defendants "to provide access to the records of any individual . . .  covered under the PAIMI Act . . . within five business days"); *Tarrant.*, 2001 WL 1297688 at *6 (enjoining defendants from "declining to release the records of . . . any other 'individual with mental illness,' . . .  when properly requested by [the P&A]"); *Gerard*, 152 F. Supp. 2d at 1178 (enjoining facility to provide access to records "as promptly as circumstances reasonably permit" once P&A provides notice it has met statutory prerequisites to access).

Without a preliminary injunction mandating strict timelines for granting DRC access to records relevant to its investigation into the death of P.B., DRC and its clients will continue to be irreparably harmed by being prevented from conducting an effective investigation into suspected neglect at the RTU.

## III.    The Balance of Equities Favors DRC

The foregoing has demonstrated the severe harm Defendants' violations of the PAIMI Act cause to DRC and the individuals with disabilities whom DRC is charged to protect. Defendants will suffer no harm if they are enjoined from continuing to violate the Act.  *See Stalder*, 128 F. Supp. 2d at 368 (finding "no harm that would come to the defendants by forcing

them to comply with" the PAIMI Act since the injunction merely requires them "to comply with the law"); *Tarrant*, 2001 WL 1297688, at *6 ("issuance of a permanent injunction should not prove to be a hardship since it requires only that the [facility] follow the law"); *Busby*, No. 02-C-871, at 20 (same).

Defendants will not be harmed by providing DRC access to confidential records because the PAIMI Act requires DRC to maintain their confidentiality to the same extent as Defendants. *See* 42 U.S.C. § 10806(a); *Houstoun*, 228 F.3d at 428–29 (Alito, J); *Gerard*, 152 F. Supp. 2d at 1175; *Stalder*, 128 F. Supp. 2d at 366. Nor must Defendants incur substantial expenses because Defendants may avoid costs of duplicating records by providing access electronically or in-person, or by assessing reasonable costs to DRC. *See* 42 C.F.R. § 51.41(e).

Finally, as the 11th Circuit Court of Appeals pointed out when a facility attempted to block a P&A's access to investigate the death of an individual with developmental disabilities: the "facility can claim no interest in avoiding investigations of harm or injury to a person with a disability . . . . Indeed, one would suppose that a facility's legitimate interests are served when abuse and neglect are uncovered and can be corrected." *J.S. Tarwater Developmental Ctr.*, 97 F.3d at 499 (citation omitted).

## IV.   The Public Interest is Served by Granting Injunctive Relief

The foregoing demonstrates that Defendants' failure to promptly provide all requested records has prevented DRC from fulfilling its Congressionally mandated purpose to protect and advocate for vulnerable individuals with disabilities. The public interest will be served by granting injunctive relief so that DRC may conduct an effective investigation into suspected neglect in accordance with federal law. *See Flint*, 146 F. Supp. 3d at 904 (finding the purposes of the P&A system "thoroughly are frustrated when the efforts of the agency designated to

advocate for the rights of mentally ill . . . individuals . . . are stymied for months on end by defendants' failure or refusal to disclose essential records"); *Busby*, No. 02-C-871, at 20 ("the fact that Congress has passed PAIMI indicates that the public is best served by its enforcement"); *Tarrant*, 2001 WL 1297688, at *6 (finding the public interest is served "by the timely investigation and resolution of concerns about the treatment of the more vulnerable members of society").

It is in the public interest to issue the preliminary injunction without requiring a security bond because Defendants' burden in complying with federal law will be minimal and the law already obligates DRC to maintain the records' confidentiality to the same extent as Defendants. *See Stalder*, 128 F. Supp. 2d at 366-368.  In addition, waiving the security requirement is appropriate because DRC is a non-profit organization advocating for individuals with disabilities.  *See Gerard*, 152 F. Supp. 2d at 1176 (waiving bond requirement because "it is unclear what 'security' [the facility] would require against improvident issuance of the preliminary injunction, and the [P&A] is a non-profit advocacy organization").  Forcing DRC to resort to litigation has already consumed scarce DRC resources devoted to protecting and advocating for individuals with disabilities who are vulnerable to abuse and neglect.

## CONCLUSION

This Court should grant DRC's motion for a preliminary injunction against Defendants' continuing violations of DRC's rights under the PAIMI Act.  DRC has demonstrated it is likely to succeed on the merits of its claims for declaratory and injunctive relief under the PAIMI Act and that it will suffer irreparable harm in the absence of preliminary relief.  Furthermore, DRC has demonstrated that the balance of equities and the public interest favor prompt access to the requested records so that DRC may conduct an effective investigation into suspected neglect and

discharge its federally mandated duties to protect and advocate for individuals with disabilities.

Respectfully submitted,

/s/ Andrew L. Milne
Andrew L. Milne (N.H. Bar No. 268073)
Francesca Broderick (N.H. Bar No. 265305)
DISABILITY RIGHTS CENTER-NH
64 North Main Street, Suite 2
Concord, NH 03301-4913
Tel: (603) 228-0432
andrewm@drcnh.org
francescab@drcnh.org

Dated:  March 6, 2018

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this day been sent by U.S. mail and

electronically to Defendants' counsel:

Lynmarie C. Cusack
Senior Assistant Attorney General
New Hampshire Department of Justice, Civil Bureau
33 Capitol Street
Concord, NH 03301
lynmarie.cusack@doj.nh.gov

/s/ Andrew L. Milne
Andrew L. Milne, Esq.